Thank you. Good morning. My name is Conte Shikala. I represent the plaintiff and appellate, Mitsui O.S.K. Lines, Ltd., also known as MOL. We're here today to ask this court to reverse and remand the district court's order on remand, which dismissed MOL's civil RICO claim. The district court liked the benefit of the MOL v. European Community, and I would like to reserve three minutes for a little response. C.C.U. presents three recent questions for determination. Whether the defendants violated Section 1962 dissociative provisions of RICO, whether the defendants' RICO conduct was the proximate cause of MOL's injury, and whether MOL suffered domestic injury to its business so as to be able to bring a civil RICO cause of action under Section 1964. The answer is no to any one of those crimes that you have pointed out. That's right. Yes, sir. I'm not trying to avoid your list. I just want to know if there are problems that have been identified. Problems for you? Yeah. What's the difference between you and me? You said you said it was the proximate cause of MOL's injury. I did. I think that all three of us are concerned about proximate causes. All right. Thank you. Thank you. So then I will very briefly deal with the first one, which is the Section 1962 determination by the District Court, which really is two subparts. The District Court applied the Enterprise Theory following the Next Circuit's decision of Chow-Hanshu, which has been abrogated since then by R.J. Arnabisco. And the District Court also made passing comments to the effect that wire fraud violations had not been shown. Counselor, in a world in which we have worldwide jurisdictions, I don't think there's any question that we've got an association, in fact, that constitutes the Rico Enterprises mail and wire fraud all over the board. I'll give you C&D, but I'm really concerned about following the money and trying to figure out whether the bulk of it has occurred outside the United States and whether anything that has occurred in the United States was actually indirect as a result of it. Sir? What's the standard of review? Well, the standard of review for — there are a series of examples in the District Court opinion where the District Court makes findings that appear to be on their face to be findings, in fact, but in certain instances are actually making findings based on either a misapplication of law or ignoring its own fact findings to those circumstances. We submit those who are subject to DINO, and I can do something about it as I work through it. Right. Mr. James, but the Rico complaint, the Parks and Recalls issue versus the FedEx United case, there was a DINO agreement. There may be some issues on the other side with regard to the FedEx United. Now, how about the judge's finding below with regard to the Parks and Recalls? It seemed like he went to it. Is something different? Sure. Well, but I think it's important. There's a great deal of interaction or intersection, rather, between the approximate cause issues and the predicate acts, which are the transmissions, the use of the mail suppliers in the United States. Let me see if I can help you get to the heart of it here. Sure. We've got false trucking invoices submitted by a phony Chinese trucking company to a Hong the money, and the money flows round and round, and Mr. Yin apparently snoops up, probably because he was the silent partner of Rainbow Trucking Company. And then when everything ends, he disappears, and we don't know where he is or what happened to him, but it all happened over there, not here. Well, so what was the district court wrong when it said these are foreign injuries, not domestic injuries that are emerging on them? Well, okay, so that's the domestic injury question, and if I can- Let's see if I don't get to the question. You can say it's not the direct cause, but the cause of the incident, correct? It's the field lady and the registration of the brakes. That's correct, and I think the best way to look at it, and this is one that actually the district court's legal errors, was characterizing the bookings, which were the actual declarations to MOL of a Shenzhen door place of receipt, which in turn triggered, among other things, the famous Rainbow Trucking as a foreign credit act, when in fact it's not a credit act at all. It's part of the schema of artifices of fraud, which has been carried out through the use of the U.S. mails and wires in three ways. First, the service contracts, which form the basis of the relationship between the MOL and the defendants, were filed with the United States Federal Maritime Commission, the service contracts and the amendments, using mails and wires to do this. Those service contracts contained the rates for Shenzhen door, these artificially remote rates that enabled the fraud to happen. In other words, Jeff, among the colleagues that have been using it, I would assume it's still with I-5-8, which came out of FACT, which is not the branch of the court. Is that right? Okay, go with that. Sure, and I would say he found that in, I would submit direct contradiction to his own findings of FACT. I would call the court's reference to findings of FACT 66-68, which are so forth in the excerpts pages 1-2 and 1-3, where Judge Conti very distinctly perceived that in 2010, when these low rates expired and the rates instead increased, the trucking rates increased to the actual cost level, which essentially made the fraud no longer work, but it didn't work anymore, that the fraud came to an end overnight. And if you accept that it's not the rates themselves, it's the damning trucking that took, that allegedly took place between Shenzhen and the court, that's what this case is about. No, that's the, I'm sorry, go ahead. That's the essence of this case. I think that's what Judge Conti was focusing on, as far as the cause analysis. Yeah, with respect, that wasn't the essence of the case. I mean, the cause analysis was a major part of the case, but it wasn't the only essence of the case. And just to follow that, I just looked at the heart of the scheme to defraud. The scheme to defraud. How much money got, got deferred? The defendants engaged in the scheme to defraud in order to obtain preferred space allocation on MOL ships. That was the corrupt bargain that was struck between the defendants and Michael Yip. Is that, I'm not sure you're interpreting it that way. It seems to me that that was the cover to explain why the Shenzhen door arrangement was necessary. But the scheme here is to defraud money, not necessarily space. The scheme had three major components. One was to defraud, to trigger the payments to Rainbow Trucking. Now, the defendants, that's how that scheme was carried, was put in place. That was the thing that the defendants gave to Michael Yip in exchange for the preferred space protection and lower terminal handling charges that they received through the fraud. Right. And that's, the preferred space protection is a very important thing. It's something that if, in fact, it was obtained in a proper way, it should have been documented in a contract or an amendment to a service hazard and filed with the United States Federal Maritime Commission. Instead, the defendants obtained the preferred space protection through this corrupt bargain and participating in a fraud with Michael Yip. I don't understand how they got to make a little more detail on how they got the preferred space protection or the currency protection for themselves. It wasn't that they had any contract for that. It's just that Yip gave it to them, right? That's right. And he gave it to them because Yip was having his money on the side. But there was no contract between the shippers and L.O.L. that they would have this preferred saving, the preferred space. That's correct. They just got it because Yip gave it to them. That was Yip Yip Yiu's decision, not his ability. Yip Yiu didn't have the ability to do that. Yip Yiu was the agent. And so you're applying, I believe you're applying as an employee in Hong Kong. The employee of our client is a Hong Kong agent. That's correct. And acting adverse to his employer and, of course, to the client. So I hear one of the books you're doing, the book that comes out, is defining other rates. Yes. What were the rates? Were they trucking rates? They were sometimes referred to as an arbitrary or a trucking add-on. And they were rates in the range of $80 to $200 per move. And if the goods had been moved from Sichuan to Hong Kong, for example, what that rate would have been? Would that rate have been lower? That rate was lower than the amounts that M.O.L. was paying to its vendors. M.O.L. was paying some $400 per move to its vendors. So the fact of the rates being low is what made the fraud profitable. And so the reason it does occur that when those rates actually raised up to the same cost as the vendor costs, the fraud came to a screeching halt, which is, well, we saved you except that. Then you have to accept that the insertion of the rates to begin with was the fraud. So if I say vendor, are you referring to the original Hong Kong manufacturer, or maybe they were a clothing manufacturer, or whatever, who actually delivered the cargo to the docks in Hong Kong at their expense? No, in the context that I just referred to vendor, I'm referring to the trucking vendors in Hong Kong. If Revo were a real trucking company, yes. But that is who M.O.L. thought they were paying to? That's correct. To the fraud, yes. Right, correct. Okay, so I'm going to get in a little bit of trouble following the money here. M.O.L. paid Revo $400 per move, but only charged the Hong Kong M.O.L. not much. No, the M.O.L. charged the defendants, in this case, anywhere from $80 to $100 per move, which they paid as part of the fraud, not only booking a door move, but paying for a door move they knew did not take place. And then that money, the amounts that the defendants paid, were later routed back to the defendants by Revo. The difference, people assume went to the M.O.L. or somewhere else. We don't know. But through the fraud, through this scheme, the defendants obtained guaranteed space protection, which, as the record makes clear, was critical to the servicing of their own customers, and paid lower terminal handling charges than should have been charged. So... Yeah, but there's an approximate cause to that. Which is why it's not what Bob is talking about. It's obvious that you've got some sort of mail fraud. In fact, you have to include in my definition of mail fraud some sort of definition of approximate cause, because we're getting false documents being sent by mail. The bills related, which misrepresent what happened, the bills relating to say that they were sucking from some interior place, Shenzhen or some other place, Hong Kong, and attempting to take it there. Right. The good news is, though, that merely facilitating an arrangement that's already been agreed to is to say, the scheme you've already agreed to is not the means by which someone is slated to enter into, will be ordinarily mail fraud, and a kind of manhunt or so will be coerced by you, by mail, and you will therefore, in reliance upon that, falsely go forward. This is what's going to take place after the fact is necessary. Yes, many things are necessary. They're meant for us, but they're not actually for us. Can you tell me how we can do this in some way or another? Thank you. So, Bridge is a very helpful case in this regard. Among other things, it cautions not to blend the elements of common law fraud with mail wire fraud, and the point that it makes is that you have a scheme or artifice to defraud. Clearly, the bookings, the false statements, or part of the scheme are artifice to defraud. Yes. And then, the transmissions and use of the wires in furtherance of that fraud steps in the plot into his word of shock, or intertwined with the fraud used in terms of streamlining. We don't have a strict approximate cost. The definition of fraud, I'm assuming, I'm going to get to. So, but now we need approximate costs. Sure. And there are three main categories of transmissions. I've already discussed the filings of the service contracts, which I think is clear, but for the filings of these artificially low rates in the service contracts, the fraud never would have happened. Yes, but for his specifications, although with approximate costs, right? I'll address the direct issue as well. But let me, if I could, just address the two other forms of transmissions. The transmission of bill of lading data to United States Customs and Border Protection after 9-11. The 24-hour rule, if you're tuned to a fact, which requires parties, before they load cargo onto ships and foreign ports, to transmit the bill of lading data points to CBP. Without the transmission of that information, the cargo would not get loaded on the ships. If the cargo is not loaded on the ships, it doesn't come to the United States. It's not the case where Estopico is fit to be defrauding the Customs and Border Protection people because they're not the ones who are partying with the money as a result of the fraudulent representation. The purpose for those filings with Customs is to ensure the integrity of our borders so that we know what's in the containers that are coming in on the ships. Correct. So, I'm still having the same trouble that Judge Fletcher is articulating with Proxima Concierge because it seems to me that the bulk of the mail and wire fraud occurred in that were supposedly moving cargo from China to the Docks at Hong Kong, and the payments were all made there. The bills were submitted there, and as the District Court found, things like the filings with Customs and Border Protection and with the Federal Maritime Commission were incidental. No one really cared about those four. That's not the heart of what this scheme triggered here, which was the payments. Well, again, the point I'm making is, in fact, the transmissions, the use of mails and wires were absolutely necessary. If those transmissions had not happened in Hong Kong, but what's the direct link between Hong Kong and the United States and the use of mail and wire facilities here? The three items I was talking about, the filing of the service contract, the transmission of bill-awaiting data to U.S. Customs, the transmission to the United States, and the transmission of shipping documents, including the bills of waiting that were presented. But theoretically, assuming this was a legitimate shipment of cargo, that cargo would already be sitting on the pier in Hong Kong, would it not be waiting for permission to either load or deport the ship, or for the ship to set sail for the United States? No, without the transmissions of the data to CBP, it would not have been loaded on the ships, it would not have come to the United States. It would still be sitting on the island. So theoretically, the shipping, the trucking, would have occurred before the report was made to Customs and Border Protection that we're about to load container A onto an oil cargo vessel, and that it's going to be sailed over. This is possibly the first shipment of thousands, but none of the others, because as soon as that shipment got held up, and other shipments got held up, the whole relationship would have crumbled. And none of it would have happened. So you're saying this was a necessary, I guess, sort of a cover-up of the scheme, right? That without this documentation, they would have been discovered sooner than they were discovered. The scheme would not have continued without any single one of these transmissions, it simply could not have happened. I take it we can still go back to both forecausation and approximate cause? Well, both forecausation is one of two parts of approximate cause, the other part being direct injury. And I realize I'm a little on time here, but the direct injury is also discussed at bridge, and the criteria at bridge require or suggest that you look at... So basically you're calling it a Japanese entity, so was the money flowing from Japan to Hong Kong to pay for all this? The money, I can focus on the domestic injury component of it, the money... Can you tell me, did money flow from Japan to Hong Kong as a result of the scheme? No, it did not flow from Japan to Hong Kong. The contracts and the payments were made in some instances in Hong Kong and some instances in the United States, the payments for these humans. This is, although MOL is a Japanese corporation, this case arises out of MOL's U.S. business. This is the cure-integrate by water in the United States trade, a business that, in order to service MOL, had to publish tariffs as required by U.S. law, file service contracts as with the defendants as required by U.S. law. It had a U.S. subsidiary agency that handled sales, marketing, customer service, operations. All of this was in support of the U.S. trade, it was MOL's U.S. business that the defendants contracted with. So you just tried, let's use that $400 figure, was that $400 transmitted from Los Angeles or San Francisco or wherever MOL's domestic offices are located, to Hong Kong in order to reimburse a Hong Kong agent for these costs? Yeah, the typical, I don't know the internal money flows at MOL, but typically the payment to Rainbow was made in Hong Kong. Right, but I'm still trying to figure out where the impact is on the U.S. operations. And it's because it's MOL's business, MOL's U.S. business, that was targeted and defrauded by the defendants in this case. The free space protection that was obtained on the ships through this fraud, which is what the defendants got out of this, was on ships coming to the United States. The failure to pay for that space protection, as they should have, those non-payments happened nowhere. The improperly low terminal handling payments that were made because of the fraud, those payments remain nowhere. The location of the payments is not relevant and it matters to what the business is that was injured and where it was injured. So if I were sitting here as a district judge, some of your arguments to say that the free space that we're at, if we're sitting here as a district judge, where did Judge Randy go wrong? Is he misguided or wrong? Will he make factual determinations about approximate costs? Is this the same thing? Sir? It's the same thing. What he did first, he held that there was a single approximate cost, as opposed to recognizing that there could be more than one approximate cost, he held that the bookings were the approximate cost. But he didn't exclude it. He didn't say, it requires the amount of volume for the one approximate cost. I just tied there. This was the approximate cost. But he did, he said- That's the second. The second one is that he characterized the bookings as a foreign predicate act. When in fact, there's no such thing as a foreign predicate act under malwire fraud statutes. Predicate acts are the transmission of the same thing, it's unlabeled. But what happened was he determined third ways. And the, well, the third one was that he, well, he ignored his own finding of fact with respect to the service contract filings as being necessary for the whole scheme to happen. He observed that the decrease in the service contract rates ended the scheme. How is it that, to be able to foreclose the fact of the approximate cost, he didn't leave it out there? Yeah, that's basically, I mean, we completely disregarded the impact of those other findings in determining whether or not there were approximate costs. I think the other side of the coin, if you want to go back to the previous question, which we want you to take care of now. I'm Eric Danoff, with Kenneth Radicek, for the Defendants and Police, Seamaster and Summitt. Clearly, the most straightforward issue in this appeal is approximate cost. Approximate cost is a separate and independent reason for denying frequent claims. It has nothing to do with extraterritoriality under RGR. RGR did not talk about approximate cost. The same law that applied when Judge Conte decided there was no approximate cost still applies. It was not modified by RGR. And as the Court well knows, approximate cost is quintessentially a case-specific fact question. Yes, well, yes, you brought up approximate cost, and you've been down for months trying to slip straight back to it. And I've been told that there's a certain type of rule of law on the train platform, and you've said, again, I'm sure as long as you're on this advisory group, and I've never understood approximate cost. It's just crazy. Well, because I've been reading about it. Well, there are many clear courts, of course, that have pointed out the case-specific actual nature of approximate cost and the clear error standard that would apply to that. Why is it clear error? There's no such thing as a 1.5. It just means there's a relative consequence of 1.5. Why is it a clear error instead of just a 1.5? It's a practical consequence as to whether these alleged predicate acts in the U.S. I don't understand what you're saying. Maybe Izzy actually brought up a little bit of the fact that there seems to be no dispute about how this thing operated. So there is no factual thing to be resolved about Izzy if she said that the only issue that was a legal consequence was the facts that are understated. Well, no, I disagree, Your Honor. For instance, bills of lading, everyone agrees that the—and there's two sets of bills of lading you're understating. One from Immobiles, one from my clients, one from my clients with customers, and the former is incorrect, the latter is correct. When that was sent to the United States, as Judge Cotty found—there's no question it was sent to the United States as bills of lading and the data on them, but Judge Cotty found as a fact no one paid any attention to that. That had nothing to do with advancing the scheme in Hong Kong. That's a factual question. Did anyone pay attention to that or not? Did it actually make a difference or not? The service contracts, the service contracts were filed in the United States with the Federal Maritime Commission. There's nothing wrong with that, that the rates were legal. What was wrong with it, again, Judge Cotty found, is that he didn't follow that in Hong Kong. That's a factual question, not a legal question. Well, no, I mean, there's no dispute about what Judge Cotty said. Well, you know, some people would call proximate cause an ultimate fact, which is, I think, one way to look at it is you take the underlying facts and you come to an ultimate fact in English, but it's still a fact as to whether there was proximate cause. I'm not disputing that fact. All right. I'm not disputing that false fact, but we know that the guy's first time on the train, the package dropped, the bins exploded. This deals in English to us as well, so that follows over on her. Nobody's fighting about anything having to do with this actual question as to what's leading up to this. But it's certainly not a legal conclusion to say that this activity and that activity did not, that no one paid attention to, that it didn't cause what happened in Hong Kong to happen. That's certainly not a legal conclusion, which is, well, the Northeasterns said that that's the factual proposition, which I do, and they seem to be disputing that. Well, okay, we're not fighting about the facts. We're fighting about the consequences of those facts. Well, we're fighting about the judges finding that those facts, these underlying facts, are the cause. We think, again, the rule of FICO, which is stricter approximate cause than you get in some places, the courts are already addressing, it's not a but-for clause standard. It's a direct cause standard, and even that is only a necessary but not a sufficient condition, as the Trollager v. Tyson Foods case cited in the brief says. Even a direct relation may not be sufficient if the causal link between the injury and the conduct is too weak to constitute prosecute cause because it is insubstantial or unforeseeable or speculative or illogical. And clearly Judge Conte found that the acts, the alleged predicate acts, did not constitute  a predicate. Do you have a clean-up reading to assist the question as to whether or not it's his actual finding which they applied earlier on the SDS Tribunal? If you find it in my favor, I don't care where you go. It's where you go. But I did want to mention that Judge Conte, and I think Judge Huck pointed this out, he never said there could only be one cause. Those words are not to be found in his opinions. He said, I find the approximate cause occurred in Hong Kong. I find it did not occur in the United States. He never said, I find it in both places, but I can only find one, and they're going to say, look, Hong Kong. So from that, that alleged error of law is not an error of law. That's not what Judge Conte found. Turning to extraterritorial reality, if I can for a second, I think it is important to follow the money. And these are the exact numbers, but I want to illustrate how the payment was paid. My clients would actually, and I'm going to use artificial numbers because it's very similar to show. My client paid $100 to LOL for trucking. That wasn't going to happen. That thing wasn't going to happen. LOL paid $200 to Rainbow. Rainbow paid $100 back to my client. So there's $100 sitting in Rainbow. Those people don't know where it is. Judge Conte awarded, by the, LOL might have asked for, Judge Conte awarded the full $200 to LOL. And we objected. This isn't the first computer. This is insane. We should at least get a credit for $100 because LOL is only out $100 because they got $100 from us. Judge Conte said, no, I'm awarding the full $200 to LOL, $100 of which is for the trucking and $100 of which is for the equivalent of the space protection that they gave you. So all the money that Judge Conte awarded, and we can, so for the term of amnesty I'll come to in a minute, was actually paid by LOL to Rainbow in Hong Kong. That's what Judge Conte awarded. Now, in addition, he awarded the terminal handing differential between Shenzhen and Hong Kong, which should have been paid in Hong Kong, but was not. We can see that on the from Shenzhen booking. So every dollar paid, every dollar awarded to LOL was paid in Hong Kong. Not one penny for damages in the U.S. was either claimed or awarded by Judge Conte. So I think it's clear this court has the findings to make that there was no infested injury in this case. I point out a lot, I cited a lot of, there were a lot of cases that have come down between my brief and now about what justifies a domestic injury, but all of them assume you're talking about recoverable damages. You know, there's something even I don't think we can do down there, but this is used as a question for Judge Conte's theory that half of those damages, they get a successive amount of money being recovered from the ground, but the other half of an Israeli restitution, and that's spent as a fee on American companies, got something that they didn't pay for. So that strikes me as a very good thing. But the test that R.J. Reynolds' case states is where did the plaintiff suffer the injury, not where the defendant got the benefit. So this is the best interest for the entry and damage, as you might suggest. I mean, I mean, in those times, people flew around and if you had a pest, there are almost very little to find, but a hundred dollars for your infested injury, which is a successive amount of money being recovered from the ground, but the other half of an Israeli restitution, whether there's a push for that, is not actually the problem. It's not where everybody wants this. It is benefiting. You got something for nothing. But that's how we measure it. Well, the test that R.J. Reynolds states, again, is not to focus on the defendant, but there's a necessary condition to allege a recall claim, which is to be a domestic injury, and whether the defendant benefited in the U.S. or not is not part of the calculation. It has to be the domestic injury, and clearly there was not in this case. So there was a claim here, but there was a discouraging claim. There was a claim that the plaintiff would be deployed to court and receive a repossession of damages, not recover, go back to court. The only damages, the court awarded. Or is there a complaining, based on the benefit to your clients, which is a contained objective? It was never part of the deal. It was not an issue. I don't really think there was a discouraging claim. All that the plaintiffs asked for were the amount of the payments. The amount of the payments paid in Hong Kong plus the terminal and the differential was not paid in Hong Kong. The first time around, they wanted a claim for discouragement. And they wanted some 11 times. Right. Because you could reinvest it at 7% or something. Oh, yeah, that goes way back to the trial. Oh, back to the trial. Yeah, back. It was the second time. Or was it the first time around? That was out. That was out. Actually, that was out. What does that mean? It's fine. It's just my judgment. I don't know. Your client intentionally received this termination here, discouraging the complaint. That's rejected. Actually, the judge rejected that after the trial, before the first appeal. He said that's not a recoverable damage. And that has never been appealed. So that's not the case. You know, the other thing I want to... It's kind of a word game. But the plaintiff is constantly saying this is harm to his U.S. business. It's actually harm to his Hong Kong business. The fact that there is a U.S. shipment that is part of this is not sufficient under RICO.   It's not enough. It's not enough. It's not enough. It's not enough. There are legal damages that can't be recovered in tangible losses for your clients and so on. The judge didn't award them. The only thing that you can recover under RICO is tangible financial loss. No U.S. tangible financial loss was ever claimed. And in the trial... The case again is different from the other cases. Other cases, Mostly decided under the pleadings. Here, we have a real trial with damages claimed. And real facts. And so, those facts are now... I'm not going to say what this court should apply. I want to mention something about premium. Because that's asked for in the briefs. This is to get to the issue of domestic damages. There are rights of district court cases out there. What do you think of the appointment? You know, I thought a lot about this. Why can't I come up with a break line rule for what constitutes a domestic injury?     Because that's asked for in the briefs. There are rights of district court cases out there. Why can't I come up with a break line rule? I think we can all think of a lot of exceptions. But that wouldn't work. I think it's a case-by-case look at what... You know, all the factors. And where the injury occurred. I do want to talk about the premium. Because, you know, Judge Fanti has said he's been dying to see this court retire. Is this case the reason for his return? It's solid.  But there may be correlation. Because it came after this case. After this case was over. And after the remand. A new district judge is going to be looking at the same record as his own. A new district judge isn't going to have the benefit of hearing the witnesses. Isn't going to have the benefit of sitting through the trial. So there's no reason to remand this case. You're going to have the same facts as a new district court judge. A remand would be a waste of time. That's all I have. Unless the court has questions. Any other questions? Any further questions? Thank you, Your Honor. I'll be very brief. First of all, the district court did not consider the FMC filings and whether or not they were approximated costs. I just wanted to point that. Secondly, even if it's a clear error standard, the failure of the district court to look at the transmissions and each of those as a necessary step in the ongoing scheme was a clear error. With respect to the issue of damages, there was indeed a disbursement claim as well as a punitive damages claim. And what Judge Conte did was he used the payments to rate them as an approximation of the damages suffered by MLL in connection with this crime. That's an issue that came up at the trial level and went up on appeal and was dealt with on remand. So the payments to RAPO actually acted as a surrogate in part for the space protection damages that were misappropriated through this crime, separate and apart from the terminal handling charges. And lastly, one more comment on domestic injury. I actually agree with Counsel for Police that the district courts don't really set forth a very clear way forward, but the statute itself does, we think, because it says we evaluate the injury to one's business or property and that in order to properly consider that, you not only look at the nature of the injury in a flexible way, but also the business that was injured in a flexible way, recognizing, largely ours, a decision that says it will not always be self-evident in any particular circumstance. Therefore, it would be great if you teach me a flexible way. Thank you. Thank you. MLL v. CMS to assist the subcontractors in how to prepare for the season. That concludes our calendar for this morning, and we're adjourned.
judges: W. Fletcher, Tallman, Huck